Counsel, you may proceed. Thank you, Your Honor. Good morning. May it please the Court. My name is Daniel Harris, and I represent the appellant in the habeas petition on Michael Hunter. This is a highly unique case. I have searched far and wide and over many, many years and have not located a single case where, when the prosecution retried a criminal defendant, it possessed all of that defendant's original trial counsel's files. This just does not happen. And it's this very unorthodox circumstance that is critical to the Court's consideration of the issues in this case, particularly the issue of prejudice. Who can argue that one would not have a market advantage or the playing field would not be tilted in his or her favor if he or she possessed all of his or her adversary's files? So, counsel, does it make a difference in your view what evidence was introduced from that file, or is it your position that simply having the file was the breach? Having the file was the breach. In this case, there were boxes and boxes of material that were made available. Ultimately, hundreds and hundreds of pages of documents were turned over. All manner of critical, very sensitive work product was produced, not just the report of Dr. Berg and the Aniline letter that everybody has focused on, but interviews with Mr. Hunter, interviews of witnesses, and all manner of documents that are privileged and either directly or indirectly contain incriminating information. So in this case, we have the advantage of being able to look at the first trial and the second trial, right? Yes, that's correct. So would it be productive for us to look at the evidence that was produced by the prosecution in the first trial and the evidence that was produced in the second trial to try to see what influence, if any, the possession of the file had? I think, Your Honor, that that is an impossible task. You know, certainly the Attorney General made that point in their brief. It is impossible because none of us can pierce the state's and the prosecution's work product and own attorney-client privilege to determine exactly how they use that material to hone examination, to create strategy, to do other things. But what I think is most significant, and it's really, I consider it to be kind of the thing that has not been addressed and was not addressed by the Court of Appeal and certainly not by the Attorney General, is the dynamic that of the prosecution having all of the material, the impact of that dynamic on the defense. So it's more than just what the prosecution could do with it. I think it also relates to the... So your argument is essentially a structural error argument as opposed to our ability to make transcripts from the first trial with the retrial and make an assessment as to whether or not there was prejudicial harm to Mr. Hunter? That's correct, Your Honor. I recognize that finding structural error is very unusual, but I think I would suggest that we can all agree on one thing, that this is a highly unusual case with an unorthodox circumstance, and that the prosecution's... It's not unusual in this sense. We do have a Supreme Court case that tells us in the context of a defendant who testifies to establish standing on a motion to suppress, that the prosecution can't use statements that the defendant makes in that proceeding in the case in chief against the defendant. But our case law says that it is permissible to use those statements for impeachment purposes if the defendant takes the stand in his defense case and testifies inconsistently with what he said at the pretrial motion to suppress, correct? As a general matter, that's certainly a correct proposition, Your Honor. And in this case, Mr. Hunter did testify in his defense at trial and made statements which, as I read the record, opened the door for impeachment by prior inconsistency in the statement. He did testify. Part of the dynamic is that pressure was put on him to testify once the prosecution had all those files. Well, counsel, how can we assess that kind of a claim? Are you suggesting that his testimony in his own defense was involuntary? Well, it impacted his ability to put on the defense uninfluenced by having to make a statement to determine how and whether the prosecution would use the material. There was no limitation issue here, as I understand it. The defense was diminished capacity. He's never he didn't deny that he committed the acts themselves that he of murdering both of his parents or his father and his stepmother, right? That's correct. Okay. So what we're what you're really asking us to do is to examine the defense testimony and evidence on diminished capacity and look at what the prosecution did with the defense file in both cross-examining the defense witnesses and in putting on rebuttal testimony to meet it. Is that correct? I still believe, Your Honor, that it's this is a circumstance that is so unusual that it infected the entire process and we can't just parachute in on Mr. Hunter appearing and testifying in his own defense. So basically the structural, we should declare it structural error and reverse and remand for a third trial? Well, I would suggest you should, but I think that you started Can this case be retried? I mean, we're talking about a murder that occurred, murders that occurred, what? In late 1981, over 30 years ago. 30 years ago? Yes. Okay. So if the case were retried for a third time, what would be the evidence that would be prohibited from being introduced? If your argument is that you can't take out of the prosecutor's, we can't see into the prosecutor's mind to see how the strategy was changed, then how would we determine what evidence could be introduced by the prosecution? Well, I think what we do is create some sort of separation where the prosecution that was involved in the earlier case could not be involved in this case, and then an order should issue that would prevent the prosecution on the retrial from using any material that was turned over in the hideous proceeding or otherwise made available so that What do we do with the fact that the witnesses themselves have been through this now twice? And no. I mean, we can't tell the prosecution expert witness, you now have to segregate from your mind the questions that were asked of you the last two times, well, at least the last time you testified, because in essence, it's the fruit of the structural error here. And in essence, it taints the witness's knowledge. I mean, how do we handle that problem? We have to have the directions from the trial court that would limit the information. I think what you're really asking us to do is to simply declare a structural error and order that he be released, that he can't be retried, because this, you know, this act has so tainted the entire case that there's no way he can get a fair trial. Isn't that what you're really asking us to do? I think Mr. Hunter would be satisfied with that result, but that's not I'm quite sure. But that is not what I'm asking for. And I would at some point like to return to the issue of whether the material was properly used for impeachment. But what you're pointing your finger or putting your finger on is a proposition that it's very difficult to unscramble the egg. And all this stemmed from the fact that Mr. Hunter asserted a six-minute right to counsel in a circumstance that I think everybody can agree on is shocking. I don't know if Your Honors have had a chance to look at the transcript, but his original trial lawyer spent 2.7 hours preparing for the penalty phase. The entire penalty phase at his first trial takes I mean, the death penalty is off the table. I mean, now we're looking at life without parole as a result of the retrial. So how is the fact that his first lawyer only spent 2.7 hours on the penalty phase relevant? Because what we're doing is we're using a circumstance that was out of Mr. Hunter's control. He had his rights deprived. He sought to vindicate those rights. And now he suffers a penalty of not receiving a fair trial either the second time around by virtue of the fact that the prosecution had all the files. But you're not saying that his defense lawyer the second time around was ineffective  I am not, Your Honor, that that defense lawyer operated under this incredible disadvantage of having to contend with the fact that the prosecution had hundreds and hundreds of pages of highly sensitive material. So, counsel, what is the clearly established Supreme Court case that you're asking us to apply in determining that the state court acted unreasonably? Simmons v. United States. It's held that it's intolerable to put a defendant in the position of having to sacrifice one fundamental constitutional right for another. In this case, Mr. Hunter was required to sacrifice his Fifth Amendment rights against self-incrimination to vindicate his right to counsel. And he had a highly meritorious claim. How is it self-incrimination for the prosecution to get the file? How is that self-incrimination? It's disclosure of information that can be used to implicate the defendant. But how is that self-incrimination? Because the material is incriminating. The statements were made under the umbrella of privilege and confidentiality. The most damaging statements were made to an agent of the attorney. It's different than, for example, a messiah claim where an agent is planted in a witness's cell and that witness, you know, under no view of confidentiality makes a statement. It's different, I think, than the suppression context where it's highly limited and the witness is counseled to be narrow in what he says in order to exercise his Fourth Amendment right. Here there's no control whatsoever because of the expectation that that material would be remain completely privileged. And it's the... Is it true that in this case the prosecutor got the documents after they had been publicly filed in state court documents, in a state court proceeding? Certain of the documents were available in the public record. And the district attorney, in violation of the protective order, made access to those materials. This court found fairly recently in the Lambright versus Ryan case. It's the protective order that's important. The fact is healing is not important. Why did you wait five years to raise the issue? That I don't understand. You're alleging that the district attorney's conduct was in breach of the federal court order, but there was never a motion to issue an order to show cause for contempt for violating the court's order? And at some point the court dissolved the order? This is a very odd procedural issue. What happened was that the court originally, the court upheld the order. It came up to this court. The court of appeal affirmed. And then based on a decision that was overruled by Bideker, the state and the attorney general moved again. And then a Judge Weir granted that order. And then Mr. Hunter's counsel immediately went in to seek an emergency reconsideration of that order. And what happened was, under applicable law at the time, under principles of federalism and comedy, Judge Weir deferred to the state court judge. And then the state court judge held a hearing, and at the conclusion of that hearing, ordered the information to be turned over to the district attorney. That's correct, Your Honor. And the state bar found that was not an unethical breach of the rules of professional comedy? The state bar did not find that. They closed their investigation, and under the state bar rules they were perfectly able, if appropriate, to reopen that investigation. But that is not a claim in Crescent, because if that was done pursuant to a superior court order, I think it's unlikely the state bar is going to impose any discipline. I agree with that, Your Honor. I mean, as I say, it's a very odd, in essence, what you're saying is the law was not clear at the time, and a federal district court judge reversed himself on the protective order, I guess on principles of comedy, and then referred it to the state court judge that was actually going to try the retrial, and that court heard the argument and ordered the relief that the state sought. And now you're saying to us that somehow this all amounts to structural error. Well, because the state court violated Mr. Hunter's issued an order that violated a number of his constitutional rights, including his right against self-incrimination. But the state courts didn't see it that way on the second round of appeals after the second trial, did they? They didn't reach the issue of error. They addressed the issue of prejudice and found it was harmless error. And I would suggest, because I only have a few seconds left. In one of your earlier remarks, Judge Tallman, you raised the proposition that in many cases even improperly obtained evidence can be used for impeachment or rebuttal, and in this case, the prosecution didn't so confine itself. It used the testimony not only as affirmative evidence of guilt in certain cases, but it certainly went beyond impeachment. In several instances, it adduced evidence from Dr. Berg that had nothing to do with impeachment or rebuttal. But Dr. Berg had offered his opinion with regard to the state of mind of Mr. Hunter at the time of the crime, thereby opening himself up to cross-examination by the state on, well, would it change your opinion if you knew the following? What's improper about that? He was not the defense witness. He was called by the prosecution in the rebuttal case. The state was able to interrupt Mr. Hunter's cross-examination to introduce Dr. Berg. That's a scheduling thing. I mean, the point is he's not called as a prosecution witness in their case in chief. He's called essentially to rebut or impeach the defense case, right? That's correct, Your Honor. Okay. I'll give you some time. I'll give you some time for the respondents and the appellees in this case. This case started out with a trial. It resulted in a conviction, two counts of first-degree murder, finding of special circumstances. It was a capital case, so there was a penalty phase. The sentence that was arrived at was death. Went through the state appeals process. The case went on to federal district court. And there the defendant made claims, many claims, including a claim that his trial counsel was ineffective in providing assistance to him. The U.S. district court found error, Brady error, in that a memo written by Robert Mueller when he was the U.S. attorney was not turned over. It was a memo that said that a jailhouse informant was not a credible witness. It was something that the deputy district attorney trying the case was unaware of, but it had been conveyed apparently to the sheriff's office. So it was an informant in this case that Mr. Mueller was addressing? Yes, and it was an informant who alleged and testified in the first trial that the defendant had offered him $1,000 to try to arrange the death of the defendant's friend, Jeff Luther, who had lured him across the Mexican border into San Ysidro where he was arrested. So the case went back for retrial. And when it did, as the court has discussed in the previous part of the argument, the district court judge ordered that the question of what to do with the files that the defendant had turned over in connection with discovery of his involving the IAC claim, that the decision of what to do with those would be left to the superior court judge during the case. And the superior court judge decided that the privilege under state law had been waived and that since this was a state proceeding, that the prosecutor should have the files. This was at the time not contrary to federal law, because at the time the controlling Ninth Circuit law was Anderson, which was later reversed or overruled by Bideker. But at the time, the state court's ruling was in accordance with the federal decision of this court. On the retrial, the prosecution put on its case again. The case was virtually the same as in the first trial, with one major exception. They did not present the jailhouse informant. They could have, of course, because by now the Mueller memo had been turned over. But they did not. The jury returned verdicts of guilty on two counts of first-degree murder and found special circumstances. It was not retried as a capital case. So the sentence was imposed by the court and not the jury. The court imposed the sentence of life without possibility of parole. The net effect here, in terms of the effect on the defendant, is that he's gone from a sentence of death to a sentence of life without possibility of parole. A clear benefit to him. The claim here is that there's some sort of structural error. And yet, ordinarily, the admission of evidence or the orders excluding evidence, that type of thing, has to do with error that is subject to a harmless error standard. A state appellate court, in this case, after the second trial, made a finding that there was no prejudice and applied the Chapman standard, the federal due process standard, that there was no error beyond a reasonable doubt. No, excuse me, not no error, no prejudice beyond a reasonable doubt. And in reviewing that decision, this court should apply the Bruck standard, which is more lenient than the Chapman standard, and should find that there was no prejudice because the case-in-chief that the prosecution presented was virtually identical. What, declare there was no prejudice or declare that the finding by the state court that there was no prejudice? No prejudice was not objectively unreasonable. I believe that what you've just articulated is the finding that was made by the U.S. District Court. And I... Well, I guess the question is, are we applying epidefference to a determination by the state courts, or is this an issue that the state court never reached, in which case we have to look at it under Bruck? I think that the controlling way of looking at it is to look at it under Brecht. However, clearly, you know, the district court judge used the other standard and looked at it under Aetba and decided that there was, you know, that the state court did not make an unreasonable determination of facts and did not make an unreasonable application of law. Certainly that decision was correct. I mean, the state court decided the issue correctly. But I think under either that standard or under Brecht, the result is the same. Well, correct my memory, but I thought that Judge Ware had granted habeas relief the first time around on just the Brady issue and never reached the ineffective assistance claim. That's correct. So then when it came up the second time after the retrial, he denied all relief, and now you're here. Yes, I got the procedural history right. Correct. Okay. All right. But you're saying that the district court applied the Aetba standard when, in fact, he should have applied the Brecht standard. I believe that's right. And if I'm wrong, I apologize. But I think that's the way it should be. Just trying to figure out what law applies to which claim is basically 75 percent of our task. At any rate, what this case involves is not structural error. It's error in terms of the admission of evidence of anything. If there is any error, we don't concede any error. And we just have pointed out that in terms of the strength of the prosecution's case and the fact that the evidence was used only in cross-examination and rebuttal, that we believe there was no error at all, but prejudice is an easier way to decide the case. But we think there was also no error. As I said, Simmons does not compel a reversal in this case. It's not a clearly established law of the United States Supreme Court that would compel reversal because the evidence here, despite counsel's claims of sort of a pervasive influence of this file material, the actual evidence that was used was only in impeachment and rebuttal. So what about opposing counsel's argument that there is no way we can discern how the information was used by the prosecution because it could have influenced the way the prosecution conducted cross-examination or structured the presentation of the case? Well, I think that the answer to that is that it's the same here as it would be in any case where the prosecution obtains information from the defense that it could not otherwise obtain and has that information before it presents its case. For example, if the prosecution or, say, police officers had obtained a statement from the defendant without giving proper Miranda warnings, the prosecution would have that information when it prepared its case and presented it. But that doesn't give the defendant a right to get on the stand and lie or to present other false evidence. What that does is it allows the prosecution to go forward with their case. They can't put in the defendant's statement that was not Mirandized at the trial. But if the defendant testifies or puts in other evidence that the prosecution considers false, the prosecution can ask to cross-examine or present rebuttal evidence to counsel. But that's a discrete piece of information, and I think counsel is making a point that it's highly unusual for the prosecution to have the entire defense file. I think it is unusual because there's relatively few cases that go to federal habeas, have an IEC claim, there's discovery, and then that case goes back. And after Biddeker, there may be many fewer where the prosecution has the evidence. But in this case, that was the situation. I don't think it means that the defendant gets a get-out-of-jail-free card. I don't think he's free from prosecution. And he got a second trial. He got a fair trial. That is to say, there was no prejudice in this. And that is really all that he's entitled to. Having had the fair trial once, there's really no point in going back and doing it a third time. And we would ask this Court to ---- The problem, as I read Simmons, is that it really doesn't answer the question before us. Simmons has very broad language right at the very end. I'm looking at 390 U.S. 395, and it says, we therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection. Now, issue of guilt, I suppose, could be interpreted to mean admissible as substantive evidence in the prosecution's case in chief. But it says nothing about use for impeachment or rebuttal. There are Ninth Circuit cases, and I think probably California State cases, that say you may use his testimony at the preliminary hearing or at a motion to suppress evidence in order to impeach him if he testifies in support of the Fourth Amendment. And I think the question is whether or not it was an unreasonable determination by the California courts to refuse that invitation. Yes, Your Honor. I think you framed it very well. The language in Simmons is rather broad. But it does not speak to the question of cross-examination and rebuttal specifically. Our position is that there's no clear precedent from the United States Supreme Court that says that the evidence cannot be used in rebuttal and in cross-examination. There are other U.S. Supreme Court cases that say that evidence obtained in other ways, as I suggested in a Miranda situation, can be used. And we believe that, given that state of the law, that the state court, in ruling that the files could be turned over to the prosecution, was not making a ruling that was contrary to clearly established U.S. Supreme Court precedent. It may be that the U.S. Supreme Court will in the future clarify that situation and specifically say, whether or not the evidence can be used in rebuttal and cross-examination. But we believe under the current state of Simmons, the state of the law being Simmons, that it's not clearly established that the prosecution could not do what they did here. And for that reason, we would ask that the court find that there was no prejudice in this case, but also that the state courts did not reach a decision that was contrary to clearly established U.S. Supreme Court precedent. Counsel, it was said that there were boxes and boxes of information provided. Are you telling me that there was nothing in there except these two pieces of information on Berg and Annaline? I did not see the boxes and boxes. I got the case in the midst of the process, after the second court conviction, and so I don't actually know what was in those boxes for sure. But I assume there was a lot of material that had to do with investigators' notes, notes by the attorneys and so forth. Here's my point. You did make the statement that the first trial and the second trial were virtually identical. Is that correct? Yes, Your Honor. I'm looking at the statement of facts from the first trial that's in the published decision of the California Supreme Court, and I've read the transcripts of the second case. So you're contending the strategy that may or may not be used by the prosecutor didn't affect the trial? I think it did not. The evidence here was, as we say, overwhelming. Under CASTIGAR, the prosecution would, if CASTIGAR applied to this case, under CASTIGAR, are you familiar with that process where the prosecution would have to prove that they didn't use the evidence illegally obtained or under a grant of immunity or whatnot and didn't derivatively use the information? Was that done in this case? No, it was not. And I think that's because the state court ruled that the prosecution could have the files, and therefore there was no need to do it. I'm also confused on the Aniline letter. There was a statement that it was stipulated. So has the defendant waived any argument with respect to the Aniline letter since it was stipulated? Well, he contested the court's order to turn over the files in the first place. But then he stipulates to the evidence. He stipulated to the evidence, but I think that had to do more with a procedural matter, that rather than having the letter come in itself, that there could be a stipulation as to what was in it. So I don't think that's quite the same thing as saying that it was okay to use the letter. But I understand the letter wasn't used substantively. Was a limiting instruction given with the Aniline letter? It was only used for cross-examination of the experts. Yes, it was. Yes, there was a limiting instruction, and it had to do with that very point that it was not to be used for the truth of the matter, only to determine what the expert's opinion was. Under the Tarasoff holding in the California court, wasn't the Aniline letter not privileged, for lack of a better term? Wasn't the psychotherapist required under California law to inform potentially the authorities or the victim, Mr. Luther, that a threat had been made against his life? I believe so. So was it privileged information or not? Oh, in that sense, no, it was not. But I mean, the privilege, I mean, our basic position is that that was part of the materials that the state court order turned over because the privilege had been waived in the federal habeas proceeding. Yes, there's another reason why the privilege was waived as to that particular piece of information, yes. All right. All right. Thank you. So, I mean, in that sense, there's, you know, multiple waivers. But the main one and the one that we're concerned about is the files themselves, because that encompasses all the information, and we believe the state court judge did not make a ruling that was contrary to clearly established Supreme Court precedent. Okay. Thank you, Mr. Crown. I've let you run over, and I promised Mr. Harris I'd give him a little extra time. Thank you, Your Honor. Mr. Harris, could you talk to us about the Annaline letter I noted that Judge Rice just asked? Yes. There was a stipulation. Can you clarify what was stipulated to?  The letter, what was stipulated was that the letter could not be offered for the truth of the matter asserted. And it's a huge record, and I don't have a precise recollection, but I do not believe that letter was ever actually sent. It was a communication between Dr. Annaline and the defense counsel, and, in fact, as the record will show, Dr. Annaline put in a declaration that was introduced, I believe in the record, saying that he overreacted and he had some dispute at the time with the defense lawyer. Maybe I misread the record, but I thought, and we can check it, obviously, but I thought the stipulation was you may use the Annaline letter as the basis for a question on cross-examination to the defense expert. Would it change your opinion if you knew that during the evaluation of Mr. Hunter, Hunter said to Dr. Annaline that he wanted to kill Luther for getting him to come back to the U.S. so he could be arrested? I believe that's generally correct, Your Honor. I just don't have the exact circumstance in mind, but a limiting instruction was obtained, and I think it's important to note in this case that, first of all, the letter was contained in the rest of the files, and that's the only means by which the prosecution obtained it. But they had the same information from the informant, the jailhouse informant, right, that Hunter was soliciting the murder of Luther because he tricked him into coming back so he could be arrested? They did not have a statement from the informant. I thought that's what Mr. Crown said that the informant was going to testify to, that he was solicited for $1,000 to kill Luther while they were in the jail in Redwood City together. And in pretrial hearings, that was Mr. Lorichala. No evidence was adduced that he was the one who was the subject of the letter written by former FBI Director Mueller to several San Mateo County law enforcement officers saying that he was clearly not in this case, but in a case that preceded the trial in Hunter. Well, I guess where I'm going with my questioning is what difference does it make if the prosecution had a legitimate reason to formulate a question on cross-examination? And, Doctor, would your opinion change if you knew that Mr. Hunter was soliciting the murder of other witnesses like Mr. Luther? He has a good-faith basis to ask the question, does he not? Yes, Your Honor. Okay. And then the next question I have for you is, other than the Aniline letter and calling Dr. Berg in rebuttal, what other evidence would you point me to that you believe was improperly introduced by the prosecution that they knew only from reviewing defense counsel's file? Your Honor, this is the same question that was posed by the Court of Appeal, and it's impossible to answer it. It's absolutely impossible to answer that question. So that gets back to the point you were making, I think, on opening, that you just have to conclude that what was done here was so improper that it just tainted the entire case. Yes. In response to a point that Judge Rawlinson made, this is not a case with one or two pieces of evidence. This is a whole entire case file. This is what distinguishes this case from the garden variety case. It's impossible to determine how the State used the material, and it's really impossible to unscramble the egg. So let me ask you the hard question then. If we don't agree with you that this is structural error, how do we conduct a prejudice analysis? Because I think the ‑‑ if you look at the fact that the ‑‑ if you go to the Breck analysis and look at the fact that the prosecution used the material and testimony of Dr. Berg beyond the scope of mere impeachment, but in fact, number one, established critical elements of guilt, namely Mr. Hunter's state of mind in this period leading up to the homicides, and number two, that the prosecution also used Dr. Berg for other purposes that certainly had a collateral impact by doing things like acknowledging that he had concluded that from his testing that Mr. Hunter was a psychopathic deviant, that he posed future danger and things like that. That went beyond the scope of rebuttal. And it's important to note that ‑‑ Doesn't that go to the penalty phase of the trial? I mean, the jury doesn't pick life without parole, right? On the retrial, that is the sentence if they find aggravated murder. There's no penalty phase in this case. Right. So then the question I have for you is what about all of the other evidence from other sources of his organized thinking, the purchase of the shotgun, the multiple statements to friends from the Navy and so on that he talked for years about killing his father, the trip that he took to Citrus Heights, the stealing of the car, the taking of the motorcycle helmet and the gloves because he knew he was going to break the window in order to get entry to the murder scene. Certainly there was substantial evidence, but there's also counter evidence about lifelong history of abuse that was potentiated critically in this period leading up to the homicides with substance abuse. And other witnesses collaborated that. Two of Mr. Hunter's three siblings collaborated substantial portions of his own testimony regarding what was going on. The conclusion of the defense psychiatric expert was that it was in this period of time and on the day of the homicides that this morbidity that Mr. Hunter had kept in check all these years from the time he was young. In fact, there's testimony that he was kicked around like a soccer ball when he was one or two years old. He had this anger. There's no dispute about it. He testified that he wanted to kill his father from a young age, that he was able to keep that in check. And due to this degenerative cycle that he was experiencing in late 1981 that culminated on attending a funeral that day, that he became rageful and had not formulated, maturely reflected and had not formulated, did not premeditate or deliberately sufficient to render him liable for a first-degree murder charge. Okay. I think we have your arguments in mind. Thank you both very much. We'll take the case under submission, get you an answer as soon as we can, and we are adjourned for the day.
judges: Rice, Tallman, Rawlinson